# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>JESUS QUINTERO-FELIX,<br><br>Defendant. | No. CR12-3002-MWB-2<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

On January 19, 2012, the grand jury returned an Indictment against the defendant Jesus Quintero-Felix ("Quintero") charging him and two other defendants with conspiracy to distribute methamphetamine (Count 1) and distribution of methamphetamine (Count 2). Doc. No. 1. He pled not guilty to the charges. On February 23, 2012, Quintero filed a motion (Doc. No. 39) to suppress evidence and statements arising out of and following his stop, arrest, detention, and interrogation on December 11, 2011. The motion was resisted by the government on March 9, 2012. Doc. No. 54. The motion has been assigned to the undersigned for a report and recommendation. Doc. No. 16.

The court held an evidentiary hearing on March 20, 2012. Assistant United States Attorney Shawn Wehde appeared on behalf of the government. The defendant appeared personally with his attorney, Stuart J. Dornan. At the hearing, the government called Omaha Police Officer Matthew McKinney. Government's Exhibits 1 and 2, the DVD recordings of the stop, and Exhibit 3, a Nebraska Law Enforcement Training Center Certificate of Completion, were admitted into evidence.

## *I. BACKGROUND FACTS*

On Sunday, December 11, 2011, at approximately 1:00 p.m., Officer Matt McKinney of the Omaha Police Department observed a pickup truck with a California

registration traveling on Interstate 80. The pickup did not have a front license plate, as required by Nebraska and California law. Officer McKinney entered traffic to overtake the pickup, and after visually confirming the pickup did not have a front license plate, he initiated a traffic stop.

Officer McKinney walked up to the pickup on the passenger side and observed luggage and several cell phones on the back seat. He explained to the two occupants his reason for the traffic stop, and requested the driver, Quintero, for his driver's license. (Gov't Ex. 1 at 1:00). Quintero did not have a driver's license, but instead gave to Officer McKinney a Mexican Consular identification card with a Riverside, California, address. The passenger, Carlos Zamudio-Hernandez ("Zamudio"), did have a driver's license. When questioned, Zamudio stated he was the truck's owner, but had no explanation for why he did not have a front license plate. On further questioning, McKinney observed that Zamudio would answer questions for Quintero, and appeared not to want Quintero to speak. He also observed that Quintero was visibly nervous, and his hands shook. Officer McKinney requested Quintero to have a seat in his patrol cruiser parked behind the truck, and Quintero agreed to do so. (Gov't Ex. 1 at 2:28).

In the cruiser, Officer McKinney conducted computer checks of the identification documents provided by Quintero and Zamudio, along with a check of the pickup's registration. While he was conducting these checks, he observed that Quintero appeared extremely nervous. Quintero's knee bounced up and down continuously, his hands were visibly shaking, and he routinely picked things off of his clothing. While waiting for the checks to process, Officer McKinney asked Quintero why he was driving without a license, and where he was coming from. Quintero initially stated that he was coming from Columbus, Nebraska, but then stated he had come from Fort Dodge, Iowa. (Gov't Ex. 1 at 3:50). He stated they had driven from California to Fort Dodge, Iowa, where they had stayed for a couple of days visiting a friend of Zamudio's, and that they were traveling

to Columbus for a couple of days to visit another friend. (Gov't Ex. 1 at 4:10). Quintero stated that Zamudio was married to Quintero's cousin. (Gov't Ex. 1 at 7:20). Quintero stated that the purpose of their trip to Columbus was for Zamudio to give a gift to an ex-girlfriend, but he did not know the name of the ex-girlfriend and did not know what the gift was. (Gov't Ex. 1 at 10:45). Although Quintero indicated that he spoke English only "a little bit," Officer McKinney did not have any difficulty conversing with him.

While they awaited the completion of the information checks, Officer McKinney requested Quintero to wait in the cruiser while McKinney spoke with Zamudio, and Quintero agreed to do so. (Gov't Ex. 1 at 12:05). Officer McKinney then approached the pickup and asked Zamudio about their trip. Zamudio stated they drove to Fort Dodge from Columbus to visit friends and his ex-girlfriend. After returning to his cruiser, Officer McKinney asked Quintero when they had left California, and Quintero stated they had left Friday, had driven straight through, and did not stop anywhere on the way. (Gov't Ex. 1 at 16:55). Quintero stated that he had to be back in California on Tuesday for work. (Gov't Ex. 1 at 18:40).

After the checks were completed, Officer McKinney issued a written warning to Quintero for the missing front license plate and for driving without a license. (Gov't Ex. 1 at 26:00). Officer McKinney gave Quintero his documents and told him he was "free to leave." (Gov't Ex. 1 at 26:35). When Quintero opened the door and started to leave, Officer McKinney asked if he could ask Quintero a few more questions. (Gov't Ex. 1 at 26:38). Quintero sat down again in the cruiser and closed the door. Officer McKinney asked if Quintero had anything of his in the truck, and Quintero said that one of the bags in the truck was his. Officer McKinney asked if he could search the truck, and Quintero stated that the police could search, but that McKinney should ask Zamudio first. Officer McKinney asked Quintero if he would wait in the police cruiser while he spoke with Zamudio, and Quintero agreed. (Gov't Ex. 1 at 27:20).

3

Officer McKinney then informed Zamudio that Quintero was "good to go," but asked Zamudio if he could search the truck. Zamudio refused. (Gov't Ex. 1 at 27:49).[1] Officer McKinney explained why he wanted to search, and stated to Zamudio that some parts of their stories did not make sense. (Gov't Ex. 1 at 29:00). Meanwhile, Officer Deignan had arrived at the scene with his police service dog. Officer McKinney asked Zamudio if he would have a problem with the dog performing a sniff around his truck, and Zamudio said, "No." (Gov't Ex. 1 at 29:30). Officer McKinney asked Zamudio to step out of the truck and stand a short distance from it, and Zamudio voluntarily did so. (*Id.*). Officer Deignan deployed the police dog around the truck, and the dog alerted to the front passenger door. (Gov't Ex. 1 at 33:23).[2] On the basis of the dog's positive indication, the officers conducted a probable cause search. (*Id.*; Gov't Ex. 2 at 1:20). They observed carpet glued to a rocker panel on the driver's side. (Gov't Ex. 2 at 19:15). After pulling a portion of the carpet away from the panel, the officers found a wire running underneath, and they found a panel of sheet metal supported by two-by-four planks across the driver's side floorboard. (Gov't Ex. 2 at 20:09). They observed a stack of what appeared to be United States currency in the same area. (Gov't Ex. 2 at 27:22). Based on their experience, the officers concluded they had discovered an electronically controlled false compartment.

The officers were unable to complete their search of the vehicle on the side of the road, and so the pickup and the defendants were transported to Omaha Police Impound Lot for further searching and accessing of the compartment via the electronic panel. The search produced a total of $16,000 in United States currency, a Ruger .357 revolver with five rounds of .357 ammunition, and 1.2 grams of suspected cocaine. Doc. No. 54-1 at

---

[1] Officer McKinney's request to Zamudio to search the truck occurred about 29 minutes after the initial stop.

[2] The dog alert occurred about 10 minutes after the end of Officer McKinney's encounter with Quintero.

4

4. Subsequently, Quintero and Zamudio were arrested and transported to the Douglas County, Nebraska, Corrections Center.

## II. DISCUSSION

At the hearing, counsel for Quintero indicated that he challenged neither the existence of probable cause for the traffic stop based on the license plate violation nor the fact that the police drug dog had provided probable cause for the search of the vehicle.[3] The sole issue was whether the police had reasonable suspicion to extend the traffic stop into an investigative detention.

Quintero's traffic violation provided McKinney with probable cause to stop Quintero's vehicle and conduct a reasonable investigation. *See United States v. Sanchez*, 417 F.3d 971, 974-75 (8th Cir. 2005). "During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Suitt*, 569 F.3d 867, 870 (8th Cir. 2009) (quoting *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008)). "A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose," *id.* at 870-71 (quoting *Sanchez*, 417 F.3d at 975), and requesting that the driver sit inside the patrol car. *United States v. Coney*, 456 F.3d 850, 857 (8th Cir. 2006). An officer has the authority to ask the passengers similar questions. *Id.* (rejecting the defendant's

---

[3] The Supreme Court of the United States recently granted certiorari on the issue of whether a Florida Supreme Court's decision that an alert by a well-trained and certified narcotics detection dog is insufficient to establish probable cause for the search of a vehicle conflicts with established Fourth Amendment precedent. *Harris v. State*, 71 So. 3d 756 (Fla. 2011), *cert. granted*, 80 U.S.L.W. 3429 (U.S. Mar. 26, 2012) (No. 11-817).

argument that the officer "unlawfully expanded the scope of the traffic stop by asking [the passengers] questions instead of simply writing [the driver] a warning for speeding"); *see also Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). "[C]onflicting stories may provide justification to expand the scope of the stop and detain the occupants." *Sanchez*, 417 F.3d at 975. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Id.* Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.*

Under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), an officer is permitted to conduct an investigative stop of a vehicle if he has "reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999); *see also United States v. Green*, 442 F.3d 677, 680 (8th Cir. 2006).

These principles were explained by the Eighth Circuit Court of Appeals in *United States v. Coleman*, 603 F.3d 496 (8th Cir. 2010), as follows:

> A stop based on reasonable suspicion must be supported by specific and articulable facts. *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008). In determining whether an officer had a "particularized and objective basis for suspecting legal wrongdoing," reviewing courts must look at the totality of the circumstances, allowing officers to draw on their experience and training. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). "Factors consistent with innocent travel, when taken together, can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent." *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006). Although reasonable suspicion must be more than a "hunch," the Fourth Amendment only requires an officer to articulate "some,

>   minimal objective justification for an investigatory stop."
>   *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir.2004).

*Coleman*, 603 F.3d at 499-500; *see United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009); *United States v. Brown*, 550 F.3d 724, 727 (8th Cir. 2008).

Quintero asserts that Officer McKinney did "not have sufficient reasonable suspicion to warrant placing [him] in his cruiser." Doc. No. 39-1 at 6. "Officer McKinney did not have reasonable suspicion to expand the traffic stop into an investigative detention. The point at which the investigative detention began was when Mr. Quintero was asked to exit his vehicle and sit in the police cruiser while the [officer] conducted a records check." *Id.* As noted above, however, an officer's reasonable investigation during a traffic stop includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose, and requesting that the driver sit inside the patrol car. Thus, once Officer McKinney had probable cause for the traffic stop, the officer's placing of Quintero in his patrol car while conducting a records check did not amount to an unlawful detention. *See Coney*, 456 F.3d at 857.

The government maintains that Officer McKinney did not expand the scope of the stop until Quintero made statements that did not make sense:

> Quintero contradicted himself by initially stating his departure location was Columbus, Nebraska, but later changing his answer to Fort Dodge, Iowa. He did not know what Zamudio's gift was even though he had driven with Zamudio and the gift all the way from California. He did not know the name of the recipient. Their travel plans did not make sense. Their stated purpose for the trip was to deliver a gift to Zamudio's ex-girlfriend, despite Zamudio being married to Quintero's cousin, and the fact that it would be easier to mail a gift than drive it all the way from California. Furthermore, it was a Sunday, and their stated destination from that point was Columbus, Nebraska, to stay for a couple of days with friends, despite Quintero's stated need to be back in California on Tuesday for work. The pair gave conflicting itinerary accounts – Quintero having stated they had driven from California straight through to Fort Dodge, and Zamudio having stated they had driven to Fort Dodge from Columbus. Finally, throughout the entire

7

encounter, Quintero displayed continous, physical nervousness, including shaking hands, trembling knees and constant picking at the clothes.

Doc. No. 54-1 at 8-9. Thus, "[b]ased on the suspicious behaviors and nonsensical statements Officer McKinney observed and heard from Quintero and Zamudio, Officer McKinney was justified in expanding the scope of his investigation of the traffic stop." *Id.* at 9.

The court agrees. Reasonable suspicion of criminal activity can found on the combination of a driver's extreme nervousness and contradictory statements. *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001). Thus, looking at the totality of the circumstances in this case, Officer McKinney had a particularized and objective basis for suspecting legal wrongdoing to justify further detention. *See United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) ("Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention or unless the continued encounter is consensual." (internal quotation marks omitted)).

Even absent reasonable suspicion by the police, the government asserts that "Quintero was no longer seized once Officer McKinney handed Quintero the warning and his documents." Doc. No. 54-1 at 10. Rather, Officer McKinney "informed Quintero he was 'free to leave,' and he merely requested further cooperation." *Id*. "The fact that Quintero opened the door of the police cruiser *before* Officer McKinney asked further questions shows that Quintero felt free to leave, but then agreed to cooperate further." *Id*.

In *Munoz*, 590 F.3d at 920-21, the defendant contended that his detention by a state trooper in the trooper's cruiser was unreasonably extended once the trooper issued a traffic citation and returned the defendant's documents. The court found, however, that, at that point, the encounter became consensual and thus did not implicate the Fourth Amendment.

8

Accordingly, the officer was not prohibited from asking questions unrelated to the traffic stop or seeking consent to search the vehicle. *Id*. at 921. The court stated the following:

> The factual findings of the district court show that [the defendant] was no longer seized once [the state trooper] handed him the citation and rental agreement. [The trooper] was the only officer present, he did not display his weapon, he did not touch [the defendant], he returned everything [the defendant] needed to continue his trip, he merely requested further cooperation, and his statements describing the drug trafficking problem did not suggest that [the defendant] was the particular focus of a drug trafficking investigation. The fact that [the defendant] reached for the door handle *before* [the trooper] asked for a moment of his time shows that [the defendant] felt free to leave, but then agreed to cooperate further. [The defendant] told [the trooper] that he should ask for [the passenger's] consent to search the [vehicle], indicating that he was allowing the continuation of the encounter. That [the trooper] told [the defendant] to remain in the cruiser while he spoke with [the passenger]—as [the defendant] suggested—did not turn the consensual encounter back into a seizure. Because [the defendant] was no longer seized, his Fourth Amendment rights were not violated while [the trooper] obtained [the passenger's] consent to search.

*Id*. at 921-22 (citations omitted).

Here, as Quintero was about to leave Officer McKinney's cruiser, the officer asked if he could ask Quintero a few questions. Quintero then closed the door and remained in the vehicle. As in *Munoz*, the court finds that Quintero felt free to leave and then agreed to cooperate further. Furthermore, as in *Munoz*, Quintero told Officer McKinney that he should obtain consent from Zamudio to search the truck, thus indicating that Quintero was allowing the continuation of the encounter. Finally, the fact that Officer McKinney asked Quintero to remain in the cruiser while the officer spoke with Zamudio did not turn the consensual encounter back into a seizure. *See id*. In light of *Munoz*, the court finds no Fourth Amendment violation while Quintero remained in Officer McKinney's police cruiser.

9

In any event, the court finds that Quintero consented to the search of the vehicle, although Zamudio, the vehicle's owner, later refused consent. In *United States v. Cedano-Medina*, 366 F.3d 682 (8th Cir. 2004), the Eighth Circuit Court set out the principles to be applied by the court in analyzing this issue:

> Under the fourth and fourteenth amendments, searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions. *See Katz v. United States*, 389 U.S. 347, 356-57, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A search that is consented to is one of those exceptions. Thus, "[a] warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Brown*, 763 F.2d 984, 987 (8th Cir.1985), *cert. denied*, 474 U.S. 905, 106 S.Ct. 273, 88 L.Ed.2d 234 (1985). The government has the burden of proving by a preponderance of the evidence that a subject's alleged consent to a search was legally sufficient to warrant admitting the fruits of the search into evidence. *See United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). This burden "'is not satisfied by showing a mere submission to a claim of lawful authority.'" *United States v. $404,905 in U.S. Currency*, 182 F.3d 643, 649 n.3 (8th Cir.1999) (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)). Rather, the government must show that a reasonable person would have believed, *see United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir.1998), that the subject of a search gave consent that was "the product of an essentially free and unconstrained choice," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and that the subject comprehended the choice that he or she was making.

*Cedano-Medina*, 366 F.3d at 684.

Here, the government has proved that a reasonable person in Officer McKinney's position would have believed that Quintero knowingly and voluntarily consented to the

search of the pickup. *See Cedano-Medina*, 366 F.3d at 684-85 (the defendant's actual subjective state of mind at the time that he allegedly gave his consent is not determinative; the question is whether it was reasonable for the officer to believe that the defendant understood what the officer was asking and gave the officer permission to search the truck, and whether it was reasonable to believe that the consent was voluntary).

Only about ten minutes elapsed from the time that Officer McKinney issued a warning to Quintero to the time that the drug dog alerted on the vehicle. About thirty minutes elapsed from the time of the stop to the time when Officer McKinney asked for Zamudio's consent to search the truck. "Even assuming that [Quintero] is correct that Officer [McKinney's] questions amounted to a seizure without reasonable suspicion, [the Eighth Circuit has] upheld seizures of less than ten minutes as *de minimis* intrusions that do not amount to an unreasonable seizure." *United States v. Robinson*, 455 F.3d 832, 834 (8th Cir. 2006); *accord Munoz*, 590 F.3d at 922; *United States v. Payne*, 534 F.3d 948, 951-52 (8th Cir. 2008) (thirty-nine-minute detention and questioning of defendant following traffic stop did not exceed scope of stop); *United States v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007) (thirty-one-minute wait for arrival of drug dog was neither excessive nor unreasonable prolongation of traffic stop that violated Fourth Amendment); *United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006) (holding that dog sniff four minutes after conclusion of traffic stop was *de minimis* extension of stop and not unreasonable).

Accordingly, for the reasons discussed above, IT IS RESPECTFULLY RECOMMENDED that Quintero's motion to suppress be **denied**. Objections to this Report and Recommendation must be filed by **April 17, 2012**. Responses to objections must be filed by **April 24, 2012**.

IMPORTANT NOTE: Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **April 10, 2012, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>**. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 3rd day of April, 2012.

*[signature: Paul A. Zoss]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT